## IN RE ALEJANDRO L. ET AL.*
### (AC 25133)

Bishop, McLachlan and Harper, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued June 2—officially released September 6, 2005

*Christine C.*, pro se, the appellant (respondent mother).

*Stephen G. Vitelli*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Matthew J. Collins*, for the minor children.

*Opinion*

HARPER, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her four minor children.[1] On appeal, the respondent claims that the court improperly determined that (1) she failed to achieve a sufficient degree of personal rehabilitation pursuant to General

---

[1] The court also terminated the parental rights of the father of the four children. Because only the respondent mother has appealed, we refer to her in this opinion as the respondent. The court terminated her parental rights as to D, who was born on May 15, 1997, J, who was born on June 2, 1998, C, who was born on June 18, 1999, and A, who was born on March 11, 2001.

Statutes § 17a-112 (j) (3) (B) and (2) her parental rights should be terminated.[2] We affirm the judgments of the trial court.

The following facts and procedural history are relevant to our discussion of the issues on appeal. On March 11, 2001, the respondent gave birth to A. The next day, hospital personnel contacted the department of children and families (department) and reported that the respondent had delivered A five weeks premature and that the respondent tested positive for the presence of cocaine. The hospital personnel additionally reported that A was demonstrating symptoms of cocaine withdrawal.

On March 13, 2001, the department referred the respondent to the New Directions outpatient substance abuse and mental health treatment program. During her initial intake appointment, the respondent admitted to the New Directions' staff that she had used cocaine as recently as March 5, 2001. New Directions discharged her from its program on April 11, 2001, because she did not comply with her treatment in that she attended only one of eight recommended therapy sessions and made little progress toward her program goals.

On April 24, 2001, the respondent again was admitted to New Directions. During the course of her admission, tests indicated that she had cocaine present in her body on both May 9 and 15, 2001. New Directions discharged

_____

[2] The respondent also claims that her court-appointed counsel had a conflict of interest and that counsel's negligence affected the resolution of the matter. "When a party raises a claim for the first time on appeal, our review of the claim is limited to review under either the plain error doctrine as provided by Practice Book § 60-5, or the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)." *State* v. *Rodriguez*, 68 Conn. App. 303, 308, 791 A.2d 621, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002). In her appellate brief, the respondent has not sought review of that particular claim under either of those doctrines. As this court has noted, "it is not appropriate to engage in a level of review that is not requested." (Internal quotation marks omitted.) Id., 308.

her from the program for the second time, again due to her noncompliance with the treatment regimen and her inability to abstain from cocaine.

On May 11, 2001, an officer from the Enfield police department found A and his three siblings left unattended in a car in the parking lot of Brookside Plaza. The respondent was not present, and the officer waited several minutes before she returned to the vehicle. He observed that the children were cold, dirty and without appropriate clothing. On May 21, 2001, the respondent again left A and his three siblings unattended in a car, which was parked outside of the department of social services' office in Manchester. On May 24, 2001, the court granted an order of temporary custody of the four children to the petitioner, the commissioner of children and families (commissioner), concluding that they were in immediate physical danger from their surroundings requiring their removal from the respondent's care.

The department again referred the respondent to substance abuse and mental health treatment facilities. The department referred her to River East, the intensive outpatient treatment program at Natchaug Hospital. The respondent did not attend her intake appointment scheduled for June 22, 2001.

On July 9, 2001, the respondent was admitted to Manchester Memorial Hospital. The medical records indicate that she was hospitalized immediately because she had attempted suicide. Specifically, she had a "self inflicted abuse laceration to [her] left wrist." During that period of hospitalization, the respondent told hospital staff that she would use crack cocaine "every time [she gets] stressed. [She] just can't handle stress." She was discharged from the hospital on July 16, 2001, at which time she refused her psychiatric medication and denied that she had any drug problem.

On July 26, 2001, the department again referred her to the River East treatment center due to her substance abuse and mental health problems. She was admitted the same day, at which time she disclosed that she had used illegal drugs in the past ten to twelve days. She further disclosed that she was using $100 worth of crack cocaine every other day. During her stay at River East, the respondent did not attend regularly her therapy sessions or her twelve step program. She was discharged on August 31, 2001, with the recommendation that she attend individual and couples counseling at the Hockanum Valley community counseling outpatient mental health and substance abuse treatment center. Her discharge prognosis was based on her lack of attendance of the programs and her tendency to minimize her addiction.

On September 27, 2001, the court adjudicated all four of the respondent's children as neglected. A was committed to the commissioner's care. The department's staff was hopeful that the children could be returned to the respondent's care in six months. The department's staff provided the respondent with a detailed account of what she needed to accomplish to regain custody of her children.

The respondent was receiving substance abuse, mental health and domestic violence counseling from Hockanum Valley. She attended her initial intake evaluation on September 18, 2001, but then failed to attend any subsequent counseling sessions. She therefore was dismissed from the program on November 19, 2001. At the time of her discharge from the program, the respondent's prognosis was poor; she had attended only one therapy session and had not accomplished any of the goals set by the program.

The department also scheduled the respondent for a hair test to determine if she continued to use drugs.

She failed to report for a hair test that was scheduled for November 14 and cancelled a test scheduled for November 20, 2001. A hair test performed on the respondent on November 30, 2001, indicated that she recently had used cocaine.

The Vernon police department arrested the respondent on a burglary charge on December 20, 2001. She was admitted to the River East treatment program again on January 9, 2002. She indicated to the staff that her cocaine addiction originated when she was twenty-one years of age. She admitted that she had used crack cocaine as recently as December 24, 2001. She was discharged from the program on February 4, 2002, because of her failure to comply with the prescribed treatment. Her discharge papers indicated that she "did poorly while in [the] program [and that she] has low motivation to follow through with any treatment plans, and is in defiance of conditions that would help her to be responsible and [participate] in a recovery program."

The staff at River East recommended that the respondent attend a treatment program that could provide a higher level of care and referred her to the Teamworks partial hospitalization program. She refused to attend the recommended program and instead indicated that she would opt to enroll in the New Directions outpatient treatment program. The respondent failed to enroll in the New Directions program.

On March 4, 2002, the respondent attended another intake appointment at Hockanum Valley community counseling. Again, she was discharged from the counseling on July 1, 2002, for failure to comply with the treatment program. At the time of her discharge from the program, her counselor recommended a higher level of care at an intensive outpatient or residential treatment program.

The department continued to make referrals for the respondent to receive substance abuse and mental health treatment. The department made a referral for the respondent to receive psychiatric treatment and individual counseling through Stafford Family Services. The department provided transportation for her. On July 15, 2002, she was discharged for noncompliance with treatment because she failed to attend any further counseling sessions or psychiatric appointments after attending her intake appointment. The department also referred the respondent to the Alcohol and Drug Recovery Center for substance abuse treatment and counseling scheduled to commence August 12, 2002; however, the respondent failed to attend the counseling.

On March 17, 2002, a family violence protective order was issued against L, the father of the respondent's four children, due to his arrest for a domestic violence incident that involved the respondent. The respondent indicated, at the time of his arrest, that L had been abusing her physically for five years. The protective order prohibited contact between L and the respondent; however, despite the protective order, the respondent continued to cohabit with L until June 17, 2002, at which time L was arrested and charged with having violated the protective order. The respondent chose to reside with L despite the department's offer of housing assistance and domestic violence prevention services to assist her in separating from L.

On April 10, 2002, the respondent was convicted of criminal trespass in the first degree and conspiracy to commit larceny in the fifth degree and sentenced to eighteen months of probation. The conditions of her probation required that she attend substance abuse counseling, not use or possess any illegal substances without a valid prescription and cooperate with the department. She failed to comply with those conditions,

and her probation officer found that she had violated the terms of her probation on August 30, 2002.

On May 20, 2002, the court committed the three other children, D, J and C, to the commissioner's care. Again, the court provided the respondent with a detailed reunification plan allowing her increased visitation and access to her children if she refrained from using illegal substances for ninety days. During the following ninety days, the respondent's behavior failed to improve.

The respondent failed to contact the department or the office of adult probation to inform them of her current address from June 19 through July 1, 2002. During the same time period, she missed two scheduled visits with her children. She missed two additional visits with her children in August, 2002.

The department learned that on August 8, 2002, the respondent was arrested for prostituting herself in Hartford and that on August 15, 2002, she had been admitted to the Stonington Institute substance abuse and mental health program. Upon admission to the Stonington Institute, she admitted that she had used cocaine as recently as August 13, 2002. On September 6, 2002, she was discharged from the program due to her failure to comply with treatment.

On September 13, 2002, the respondent again was admitted to the River East treatment program. She relapsed during the first week of the program and then, after missing treatment without informing the staff, she was suspended for three days. She returned to the program but again failed to contact the program's staff after missing treatment and was discharged from the program, against medical advice, for noncompliance with treatment and failure to communicate with the staff.

On December 9, 2002, the respondent was admitted to Hockanum Valley community counseling's outpatient

substance abuse and mental health treatment program for the third time. The program's records indicate that she "went back to her boyfriend, and then she cancelled appointments with [her counselor], and [her counselor] didn't see her again." The respondent had not attended counseling sessions and her medication management appointments with her psychiatrist; therefore, at the time of trial, the program discharged her for the third time because she failed to comply with treatment.

The department also provided the respondent with a family reunification service through the Kidsafe agency. Kidsafe monitored her visitation and provided the respondent with parenting coaching, strategies and techniques. Kidsafe determined that the respondent was failing to improve her ability to parent her four children and discharged her from its reunification program. Kidsafe continued to allow supervised visitation service for the family. The Kidsafe staff voiced concerns over the respondent's activities during her visits with the children, specifically, an altercation between L and the respondent that took place in Kidsafe's parking lot on November 28, 2002, and an incident on February 13, 2003, when she inappropriately discussed a new boyfriend with the children.

In the spring of 2003, shortly before trial, the respondent chose to cohabit again with L. She made the decision to reside with L despite repeated urgings by the department, the court and various treatment providers encouraging her to sever her relationship with L. She was aware that residing with L would severely jeopardize her ability to achieve sobriety and to attain a relationship with her children.

A's siblings have resided at the same foster home since February, 2002. The foster parents are ready and willing to adopt the children. The children have bonded

with the foster parents and identify them as their "mommy" and "daddy."

A has been cared for by his foster parents since he was two and one-half months old. When he was first placed in their care, he had been tentatively diagnosed as a failure to thrive infant due to malnutrition. His condition improved under the care and attention of his foster parents, and he has achieved all age appropriate milestones. He is extremely attached to his foster parents and identifies them as "mommy" and "daddy." A's foster parents and his siblings' foster parents support ongoing and frequent contact among the siblings.

The court-appointed guardian ad litem recommended that it was in each child's respective best interest to have the respondent's parental rights terminated and to be freed legally for adoption by their foster parents. The commissioner filed petitions on October 2, 2002, to terminate the parental rights of the respondent. The respondent appeared in court and had counsel appointed for her. Counsel also was appointed for the minor children.

The termination of parental rights hearing was held on May 20, 2003. The court found "by clear and convincing evidence that grounds exist to terminate [the respondent's] parental rights and that it is in the children's best interest[s] to do so . . . ." The court ordered the termination of the respondent's parental rights and appointed the commissioner the statutory parent for the purpose of securing an adoptive family for the children with first consideration to be given to the preadoptive foster parents. The respondent's appeal followed.

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if

it is clearly erroneous in light of the evidence in the whole record. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 498–99, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

"The standard of review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted). *In re Tyqwane V.*, 85 Conn. App. 528, 534, 857 A.2d 963 (2004).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003).

I

The respondent claims that the court improperly determined that she failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B). We do not agree.

Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). We have stated that "[p]ersonal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a . . . delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 832–33, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

"[T]he adjudicatory determination to be made by the trial court is whether the parent of a child who has been found by the [S]uperior [C]ourt to have been neglected [or] uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child

. . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child." (Internal quotation marks omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 499–500. "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." *In re Stanley D.*, 61 Conn. App. 224, 231, 763 A.2d 83 (2000); *In re Michael L.*, 56 Conn. App. 688, 694, 745 A.2d 847 (2000).

"Although the standard is not full rehabilitation, the parent must show more than 'any' rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation." (Citations omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 500. "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Amneris P.*, 66 Conn. App. 377, 384, 784 A.2d 457 (2001). Thus, even if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children. See, e.g., *In re Eden F.*, 250 Conn. 674, 699–708, 741 A.2d 873 (1999); *In re Jennifer W.*, supra, 498–500; *In re Amneris P.*, supra, 383–85; *In re Sheila J.*, 62 Conn. App. 470, 479–82, 771 A.2d 244 (2001); *In re Mariah S.*, 61 Conn. App. 248, 260–67, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001).

Our review of the record reveals that the evidence credited by the court supports its conclusion that the respondent failed to attain a degree of rehabilitation

sufficient to warrant the belief that within a reasonable period of time, she would be capable of assuming a responsible position with respect to the children. The court reasonably relied on the testimony of mental health experts regarding the depth and seriousness of the respondent's mental health problems and the uncertainty the experts expressed as to how long it could take before she might be in a position to parent the children. See *In re Tabitha P.*, 39 Conn. App. 353, 365 n.8, 664 A.2d 1168 (1995) (courts entitled to give great weight to testimony from professionals in termination of parental rights cases).

The respondent was given specific steps to take toward reunification with her children from the inception of the department's involvement with them. She was repeatedly unsuccessful in her attempts to seek drug treatment and mental health counseling and failed to comply with or to participate consistently in the programs to which the department referred her. The respondent also maintained a relationship with L despite the fact that her drug counselors advised her to sever her relationship with him because he was an impediment to her obtaining and maintaining sobriety.

We conclude that the court's finding, by clear and convincing evidence, that the respondent failed to achieve a degree of rehabilitation as would encourage the belief that within a reasonable period of time she could assume a responsible position in the children's lives was not clearly erroneous.

II

The respondent next claims that the court improperly determined that her parental rights should be terminated. We do not agree.

In the adjudication phase of the proceedings, the court determined that the respondent had failed to reha-

bilitate herself as discussed in part I. Because the court determined by clear and convincing evidence that a statutory ground for termination of the respondent's parental rights exists under § 17a-112 (j), the court proceeded to the dispositional phase, in which it determined that termination was in the best interests of the children. See *In re Brea B.*, supra, 75 Conn. App. 469–70.

The respondent had a serious and long-term history of drug abuse and failed at numerous attempts to complete counseling to remedy her drug abuse problem. She also suffered from substantial mental health problems for which she continually failed to complete treatment. The court noted that the respondent "has had many opportunities to stabilize her own life in order to be able to provide her children with the stability their development will require." On two occasions, she left A unattended in a motor vehicle. The court considered the children's safety and the importance of long-term stability in their lives. The court further considered the guardian ad litem's recommendation that the respondent's parental rights be terminated so that the children would be provided for properly.

In its decision, the court found by clear and convincing evidence that the children's best interests would be served by granting the petitions to terminate the respondent's parental rights. In support of that finding, the court noted that much of the children's short lives had been spent in the custody of the commissioner, and that the children needed stability and permanency in their lives. On the basis of those facts, we conclude that the court's determination that the respondent's parental rights should be terminated was not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.