IN RE HALLE T.*
(AC 25675)

Flynn, C. J., and Schaller and Peters, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued March 20—officially released August 8, 2006

*Steven R. Dembo*, with whom, on the brief, was *P. Jo Anne Burgh*, for the appellant (respondent father).

*Mary-Anne Ziewacz Mulholland*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Jason W. Glasgow*, for the minor child.

SCHALLER, J. This court recently observed that "[t]he sad fact is that there is a difference between parental love and parental competence." *In re Christina M.*, 90 Conn. App. 565, 575, 877 A.2d 941, cert. granted on other grounds, 276 Conn. 903, 884 A.2d 1024 (2005). In the present case, we again are required to undertake the difficult task of determining whether a trial court properly terminated the parental rights of an individual who unquestionably loved his minor daughter but displayed an inability to provide sufficient care and support for his medically fragile child. The respondent father[1] claims that the trial court improperly (1) violated his federal and state constitutional rights by adopting verbatim significant portions of the social studies in its memorandum of decision and (2) concluded that the evidence adduced at trial was sufficient to terminate his parental rights. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our discussion. On January 28, 2002, the petitioner, the commissioner of children and families, filed a neglect petition alleging that the child was denied proper care and affection and was permitted to live in conditions injurious to her well-being. The petitioner also claimed that the child was uncared for because she was not provided with the specialized care that she required. The child was born with fetal alcohol syndrome and demonstrated indicia of numerous developmental deficiencies.[2]

---

[1] The petitioner, the commissioner of children and families, also sought to terminate the parental rights of the child's mother. She consented to the termination of her parental rights on May 13, 2004, and is not a party to this appeal. We therefore refer in this opinion to the respondent father as the respondent.

[2] Mary Jane Todd, a pediatric nurse who treated the child, testified that fetal alcohol syndrome affects a child "through exposure to alcohol by one or two—or both parents throughout the pregnancy [and] gives [the child] some congenital defects. [The child] has the wide space eyes. Her [face is]

On April 11, 2002, the child's mother sent the child to live with the respondent. On May 1, 2002, she notified the petitioner that the respondent sounded intoxicated when she spoke with him on the telephone at 8:30 in the morning. The mother was concerned about the condition of the respondent, who was scheduled to drive the child to a medical appointment. In response, a social worker telephoned the respondent. During this conversation, the social worker noticed that the respondent's speech was slurred and that he was unable to answer questions posed to him. The social worker then traveled to the respondent's home.

Upon arriving at the residence, the social worker observed the respondent "staggering" and smelling of alcohol. The respondent admitted to drinking tequila at four o'clock in the morning. The child was found in a crib wearing a diaper soaked from diarrhea and urine. The petitioner invoked a ninety-six hour hold and placed the child in protective custody.[3]

The court on May 2, 2002, found the child to be neglected and uncared for and set specific steps for the respondent to regain custody of her.[4] The court, inter alia, instructed the respondent to keep all appointments

---

very typical of children with fetal alcohol syndrome. They're often very sensitive to stimulation. You know, they're easily overstimulated and have a hard time dealing with loud noises. They're often retarded, have problems walking. Some, you know, eventually do—you know, some walk some. Some are so bad they don't ever walk. And they almost all have some visual problems and, of course, learning impairments."

The child also suffers from seizures, which are controlled with the drug Topamax, and has difficulty swallowing. In addition to care from her pediatrician, the child receives medical treatment from a cardiologist, ophthalmologist, neurologist, physical therapist and an occupational therapist. As a result of these numerous health issues, the child functioned at the level of an eleven month old when she was twenty-six months old.

[3] General Statutes § 17a-101g permits the petitioner to remove a child from unsafe surroundings under a ninety-six hour hold.

[4] See General Statutes § 46b-129.

with the petitioner, keep his whereabouts known, participate in counseling, attend parenting classes for children with special needs, learn about the child's special needs, submit to a substance abuse assessment and random drug testing, refrain from substance abuse, and maintain adequate housing and legal income.

The petitioner eventually placed the child in the custody of P, the respondent's stepdaughter. The respondent objected to this placement; nevertheless, the commitment was maintained on April 17, 2003. The initial goal of the permanency plan, filed in February, 2003, was reunification of the respondent with the child. On July 7, 2003, after learning of two instances of excessive alcohol use by the respondent, the petitioner revised the permanency plan and moved to terminate the parental rights of the respondent and the child's mother. See General Statutes § 17a-112. The petitioner alleged that the respondent failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he would be able to assume a responsible position in her life.

The court held a hearing over the course of several days. At the conclusion of this hearing, the court denied the petitioner's motion for termination of the respondent's parental rights. The court ordered the respondent and P to pursue family counseling. The court continued the placement of the child with P. The court "felt that [the respondent] should be given more time to prove that he could care for [the child]."

The petitioner subsequently renewed its motion to terminate the respondent's parental rights. Two social studies, dated January 2 and April 8, 2004, were completed. The court held a hearing on May 13, 2004, and issued its memorandum of decision on July 14, 2004. The court found that the petitioner had proved, by clear

and convincing evidence, that the department of children and families (department) had made reasonable efforts to reunify the respondent and the child.[5] The court further found that the petitioner had proven that the respondent had failed to achieve rehabilitation or to restore himself to a constructive and useful role as a parent. See General Statutes § 17a-112 (j) (3) (B) (ii).[6] "Although [the respondent] appears to love and care for the child and has attempted to gain knowledge and understanding of her medically and mentally complex status, it is readily apparent in his testimony and actions with the child that he lacks the awareness and insight necessary to accommodate and meet her complex needs at this time. This failure of [the respondent] to manifest this understanding and awareness from [the child's] birth . . . to the present, despite the fact that services and opportunities have been made available, but not fully utilized, and his failure to demonstrate such a degree of personal and positive support for [the child], lead to the belief that within a reasonable period of time, considering [the child's] age and needs, [the

---

[5] "While a finding of neglect, resulting in non-permanent custody, may be proved by a fair preponderance of the evidence, all of the elements of the termination of parental rights petition must be proved by clear and convincing evidence." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 828 n.7, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

[6] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . (2) that termination is in the best interest of the child, and (3) that . . . (B) the child . . . (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

respondent] would be unable to impart an ability or capacity to assume a responsible position in the life of his child."

In the dispositional phase of the proceedings, the court made findings pursuant to the seven factors listed in § 17a-112 (k).[7] Notably, the court found that the child had little, if any, positive feeling toward her mother or the respondent but appeared bonded to and had significant emotional ties with P. The court ultimately found that it was in the child's best interest that the respondent's parental rights be terminated.[8] This appeal followed. Additional facts will be set forth as necessary.

[7] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[8] "The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . Although that ultimate interference by the state in the parent-child relationship may be required under certain

At the outset, we note the standard of review and legal principles germane to our discussion. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Sheena I.*, 63 Conn. App. 713, 719–20, 778 A.2d 997 (2001); see also *In re Javon R.*, 85 Conn. App. 765, 768–69, 858 A.2d 887 (2004); *In re Kristy A.*, 83 Conn. App. 298, 305–306, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004).

Our Supreme Court has stated: "In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in

circumstances, the natural rights of parents in their children undeniably warrants deference and, absent a powerful countervailing interest, protection. . . . Termination of parental rights is a most serious and sensitive judicial action." (Citations omitted; internal quotation marks omitted.) *In re Luis C.*, 210 Conn. 157, 164–65, 554 A.2d 722 (1989).

§ 17a-112 (j) (3)." *In re Samantha C.*, 268 Conn. 614, 628, 847 A.2d 883 (2004).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child. In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in . . . § [17a-112 (k)] . . . ." (Internal quotation marks omitted.) *In re Vanna A.*, 83 Conn. App. 17, 21–22, 847 A.2d 1073 (2004).

I

The respondent first claims that the court violated his federal and state constitutional rights by adopting verbatim significant portions of the social studies in its written memorandum of decision. Specifically, he argues that his substantive due process rights were violated because "more than fifty (50%) percent of the [d]ecision consists of unattributed quotations from [the petitioner's] social study, dated April 8, 2004."[9] We conclude that, in the present case, in which sufficient evidence supported the court's decision, the specific

[9] The petitioner does not dispute the respondent's claim that significant sections of the court's memorandum of decision have been taken verbatim from the social studies. Our comparison of the social studies with the court's memorandum is consistent with this undisputed claim.

manner in which the court crafted its memorandum of decision was not of constitutional magnitude.[10] Accordingly, we reject the respondent's claim.

In *Cameron* v. *Avonridge, Inc.*, 3 Conn. App. 230, 486 A.2d 661 (1985), the plaintiffs appealed from the judgment rendered in favor of the defendant and claimed, inter alia, that "they were denied a fair trial because the court wrote a twenty-two page memorandum of decision which adopted, almost verbatim, the defendant's trial brief." Id., 233. We rejected this claim. "[T]he trial court specifically acknowledged in its memorandum of decision that it relied heavily on the defendant's trial brief because the facts and legal theories advanced therein were consistent with the court's views, and it did not believe that it could improve on the defendant's language. *Although we do not approve of this practice, we cannot find that it resulted in less than a fair trial.* Nor was there any manifest abuse of discretion or injustice." (Emphasis added.) Id., 235.

In *Grayson* v. *Grayson*, 4 Conn. App. 275, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987), the defendant argued that she was denied a fair hearing with respect to her motion to open the judgment of dissolution on the ground of fraud because the twenty-three paragraph fact section in the court's memorandum of decision was taken verbatim from the plaintiff's proposed findings of fact. Id., 276–79. We noted our "strong disapproval" of this practice. Id., 284. "We stress this matter because of the grave importance of fact-finding. The correct finding, as near as may be, of the facts of a law suit is fully as important as the

---

[10] Our Supreme Court has stated that "the words [a trial judge] used to perform this task [of preparing a memorandum of decision are] within [his] broad judicial discretion. Reversal is required where the abuse of discretion is manifest or where injustice appears to have been done." *Long* v. *Schull*, 184 Conn. 252, 258, 439 A.2d 975 (1981); see also *D'Angelo* v. *McGoldrick*, 239 Conn. 356, 360 n.4, 685 A.2d 319 (1996).

application of the correct legal rules to the facts as found. An impeccably right legal rule applied to the wrong facts yields a decision which is as faulty as one which results from the application of the wrong legal rule to the right facts. The latter type of error, indeed, can be corrected on appeal. But the former is not subject to such correction unless the appellant overcomes the heavy burden of showing that the findings of fact are clearly erroneous. . . .

"It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts. . . .

"We can add little to this statement except to note that the practice of adopting parties' proposed findings of fact invites error or sloppy analysis on the judge's part. More importantly, the appearance of justice is just as important as the reality, and a verbatim adoption of the facts [proffered] by one of the advocates invites a public suspicion of the trial court's decision. The perceptions by the public and by the losing litigant of our system of justice are surely not enhanced by such a practice." (Citations omitted; internal quotation marks omitted.) Id., 283–84.[11]

Despite our unequivocal disapproval of this practice,[12] we nevertheless agreed with the "unanimous authority"; id., 284; found in an annotation entitled "Propriety and Effect of Trial Court's Adoption of Findings Prepared by Prevailing Party," 54 A.L.R.3d 868 (1973), that a verbatim adoption of the findings proposed by

---

[11] Our Supreme Court subsequently characterized the verbatim adoption of the findings of fact drafted by a plaintiff as "deplorable." *Grayson* v. *Grayson*, 202 Conn. 221, 223, 520 A.2d 225 (1987).

[12] See also *Ernst Steel Corp.* v. *Reliance Ins. Co.*, 13 Conn. App. 253, 257 n.5, 536 A.2d 969 (1988); *Hartford* v. *Tucker*, 8 Conn. App. 209, 214 n.10, 512 A.2d 944 (1986).

a prevailing party is not a per se finding of a denial of a fair trial. *Grayson* v. *Grayson,* supra, 4 Conn. App. 284–85. Instead, "[t]he ultimate test as to the adequacy of [the] findings is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for the decision and *whether they are supported by evidence.*" (Emphasis added.) Id., 285; see also *MacCalmont* v. *MacCalmont,* 6 Conn. App. 117, 118, 503 A.2d 624 (1986). We also rejected the minority approach of a more scrutinized review of the court's findings in these types of cases "because a conscientious appellate court will make such examination of the record as is necessary in every case in which it is claimed that the finding is not supported by the evidence." *Grayson* v. *Grayson,* supra, 285.

We remain mindful of the "suffocating court dockets" and the "desire to hasten the procurement of justice." (Internal quotation marks omitted.) *Doe* v. *Bridgeport Hospital,* 40 Conn. App. 429, 434, 671 A.2d 405 (1996). Nevertheless, we reassert our emphatic disapproval of the verbatim adoption from another source of the fact section in a trial court's memorandum of decision, whether it be a proposal submitted by the prevailing party, or, as in the present case, directly incorporated from documentary evidence. We recently emphasized the need for thorough and comprehensive factual findings. "Particularly in cases involving the care and custody of children, it is incumbent on the trial courts to provide a decision, whether written or oral, that includes all of the necessary factual findings for the benefit of the parties, as well as for proper appellate review." *In re Patricia C.,* 93 Conn. App. 25, 32 n.8, 887 A.2d 929, cert. denied, 277 Conn. 931, 896 A.2d 101 (2006). This need is not met by wholesale adoption of work produced by one of the parties or other participants, in this case, the preparers of the social studies.

We emphasize the importance "as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper. The trial court is the most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts. When a . . . trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are clearly erroneous, no upper court may disturb them. To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible. For that very reason every effort should be made to render it as adequate as it humanly can be." (Internal quotation marks omitted.) *Grayson* v. *Grayson*, supra, 4 Conn. App. 297–98 (*Borden, J.*, dissenting); see also *In re Tyqwane V.*, 85 Conn. App. 528, 539–40, 857 A.2d 963 (2004) (same).

We have made clear that "parroting" significant portions from an exhibit into a memorandum of decision is a course of action that we neither endorse nor approve. Nevertheless, it is one thing to assess the actions of a trial judge with a critical eye and something quite different to conclude that such action is unconstitutional and violates a party's right to substantive due process.[13]

The respondent failed to provide us with any citation to a case holding that the manner in which a trial court

[13] Our Supreme Court has "stated on numerous occasions, a party cannot transform a nonconstitutional claim into a constitutional claim simply by virtue of the label placed upon it." *State* v. *Whipper*, 258 Conn. 229, 279, 780 A.2d 53 (2001), overruled in part on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004); see also *State* v. *King*, 249 Conn. 645, 680 n.39, 735 A.2d 267 (1999); *State* v. *Schiappa*, 248 Conn. 132, 164, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

crafted its memorandum of decision rises to the level of violating either the federal or state constitution. We decline the invitation to analyze with a constitutional lens the style or method employed by the trial court, despite our disapproval of the trial court's actions in the present case. The critical issue in this case is not how the court reported its findings but whether sufficient evidence supported the court's finding that the petitioner proved, by clear and convincing evidence, that termination of the respondent's parental rights was proper.[14] We will, therefore, identify the relevant portions of the court's decision and determine whether they are supported by sufficient evidence.

The court found that "[a]lthough [the respondent] has been partially compliant for the most part with

---

[14] We note that constitutional implications permeate all termination of parental rights cases. "Like every other court in this country, we are mindful of our responsibility to respect and protect the constitutional rights of parents, rich or poor, to make decisions about the care, custody and control of their children. Like all other rights, however, these rights can be lost. The family is not . . . beyond regulation in the public interest, and the rights of parenthood are not beyond limitation." (Internal quotation marks omitted.) *In re Christina M.*, supra, 90 Conn. App. 584–85.

The decision to extinguish the parent-child bond requires close consideration, due to its grave importance. *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996). The United States Supreme Court has held that "the Due Process Clause of the Fourteenth Amendment demands more than [proof by the preponderance of the evidence to terminate parental rights]. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky* v. *Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The court noted the "fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] [which] does not evaporate simply because they have not been model parents or have lost temporary custody of the child to the State. Even when blood relationships are strained, parents retain a vital interest in preserving the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Id., 753–54; see also *In re Eden F.*, 250 Conn. 674, 688 n.19, 741 A.2d 873 (1999).

services offered, he has thus far failed to grasp a competent knowledge and understanding of [the child's] medically complex status. To date, [the respondent] continues to lack awareness of how to specifically provide and care for his daughter's needs. Due to this lack of understanding, he currently does not have the insight necessary to care for his daughter's needs and be a positive support of her need for continuous treatment." After setting forth the various programs that had been offered to the respondent to educate and assist him in caring for the child, the court found that he had failed to grasp fully the severity and complications of her medical condition. The court also noted that the thirty-one month old child had spent twenty-five months in the care of her foster family. The court stated: "It is more sadly evident that [the respondent] has continued to demonstrate his inability to appropriately meet the physical, medical and emotional needs of [the child]. As has been noted, [she] is a physically, medically and emotionally fragile child who is completely dependent on a sober, competent caretaker."

The court ultimately found that the evidence demonstrated that the child would require intense care and support for a long time. Despite the respondent's obvious love for the child, it was apparent, from the evidence presented, that he lacked the ability to accommodate and to meet her needs. "This failure . . . to manifest this understanding and awareness from [the child's] birth . . . to the present, despite the fact that services and opportunities have been made available, but not fully utilized, and his failure to demonstrate such a degree of personal and positive support for [the child], lead to the belief that within a reasonable period of time, considering [the child's] age and needs, [the respondent] would be unable to impart an ability or capacity to assume a responsible position in the life of

his child." We now must determine whether the evidence adduced at trial supported the court's findings.

Rushnee Vereen Penix, a social worker employed by the petitioner, testified that the respondent believed that the child would "outgrow" the effects of fetal alcohol syndrome. She also indicated concern regarding his ability to advocate for the child with respect to her medical needs. She noted that the respondent failed to ask questions or take notes regarding the child's condition during her treatments. She also observed, on one occasion, that the respondent had difficulty feeding the child and did not attempt to follow the instructions that had been provided to him. Penix concluded that the respondent was in denial regarding his daughter's fragile medical condition. Penix then summarized: "In terms of basic things such as changing a [diaper], the ability to feed her, being able to play with her, he can do those things. I have observed him doing those things. The alcohol is definitely a problem because she—as I stated earlier, she is a very, very medically fragile child, and she needs a competent caretaker, and he—that definitely has to be addressed. One of the fears is, you know, him being under the influence while taking care of her. She needs somebody that, you know, is there and is not intoxicated. Also, the inability to grasp what her medical needs are. He does not—he does not understand it despite the programs he was referred to; despite the literature, he cannot—and I understand he may not be able to put in medical terms what her issues are, but just to even give a basic description of what is going on with her, he cannot do that."[15]

---

[15] A psychological study, dated October 9, 2002, indicated that the respondent did not understand fetal alcohol syndrome and thought that the child would "outgrow it." The author further noted that the respondent appeared unaware of the child's developmental issues and instead consistently commented on her beauty and growth. The respondent was unable to discuss her medical condition. Our Supreme Court has indicated that "[p]sychological testimony from professionals is rightly accorded great weight." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667, 420 A.2d 875 (1979); see also *In re Eden F.*, 250 Conn. 674, 707, 741 A.2d 873 (1999).

The court also heard testimony from Nada Gerta Light, a pediatric and child psychiatric nurse. As part of her employment duties, she provided educational training to parents of children with special needs. During her sessions with the respondent, he made it difficult for Light to maintain the focus on the child and her medical condition, rather than on himself and his personal problems. On one occasion, she consistently had to remind him to keep the child upright for thirty minutes after a feeding to prevent a reflux from occurring.[16] She further stated that he failed to demonstrate a "knowledge [that] child development certainly [had been] compromised by the fetal alcohol syndrome." She referred to two instances as examples of this. First, the respondent's strong desire to see the child stand and walk, despite the fact that it was medically inappropriate at that time. Second, the respondent described the child as "lazy." In her opinion, the respondent did not have realistic expectations of his daughter. Light believed that, if not for his denial of his daughter's conditions, the respondent would have made more progress.

Light also testified that the respondent often was distracted by outside events during his sessions. He never took notes or requested information on either the child's medical condition or the medications she was taking.

On June 3, 2003, P testified that the respondent often disagreed with the diagnosis of fetal alcohol syndrome and insisted that "everything was fine" with the child. She also had observed that he never took notes or asked questions regarding the child's medical condition. Another social worker, Rebecca Stewart, stated that

---

[16] Light explained that reflux occurs when food travels back up from the stomach into the esophagus.

the respondent had displayed reluctance to follow suggestions regarding the proper method to hold the child and provide her with a drink.

On May 13, 2004, the court heard additional testimony regarding the termination of the respondent's parental rights. Mary Jane Todd, a pediatric nurse practitioner, indicated a concern regarding the respondent's inability to follow medical advice regarding the child on a consistent basis. She further testified that without consistent daily repetition, the child would not maximize her potential. She also noted that the respondent demonstrated difficulty in picking up cues from the child that she was done feeding.

Susan E. Nolin, an educational specialist, subsequently stressed, during her testimony, the importance of consistent structure and routine for the child. In her expert opinion, she indicated that P was the better person to respond to the child's needs due to her background and experience with children with special needs. Nolin further stressed the importance of the availability of P's family, which could provide her with help and support in caring for the child. She also indicated that the respondent never asked specifically how he could assist in the child's development. She also noted that during her sessions with the respondent, he failed to maximize his opportunity to obtain information regarding the care of the child.

William Morris, the author of the January 2 and April 8, 2004 social studies that recommended the termination of the respondent's parental rights, also testified at the hearing. Morris testified that when the instructors were not present, the respondent was less likely to use the techniques and skills he had been taught. Morris also stressed the importance of establishing a permanent situation for the child. He ultimately concluded that although the respondent had made progress, he was

not ready to be the child's full time caretaker. Morris also indicated that the respondent never provided him with a name of a day care provider with training in caring for children with special needs, despite the respondent's claims of finding such an individual.

Our review of the record reveals that the petitioner set forth sufficient, i.e., clear and convincing, evidence to support the court's factual findings regarding the termination of the respondent's parental rights, despite the parroting of the social studies.[17] We reiterate that we "do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Sheila J.*, 62 Conn. App. 470, 477, 771 A.2d 244 (2001). Because the evidence supports the findings set forth in the court's memorandum of decision, we conclude that the manner in which the court elected to set forth those findings did not result in the violations claimed by the respondent. In other words, the verbatim adoption of portions of the social studies did not dilute the petitioner's burden of proof, as argued by the respondent. We note, however, the importance of independent and impartial fact-finding by the trial court, particularly, in cases involving parental rights and the care and custody of children.

## II

The defendant next claims that the court improperly concluded that the evidence adduced at trial was sufficient to terminate his parental rights. Specifically, he

[17] The respondent refers to evidence in the record pertaining to his undisputed love of the child and his efforts to comprehend and to address her medical condition. Despite his laudable attempt at rehabilitation, we cannot conclude that the court's findings were clearly erroneous.

argues that the court improperly found that he had failed to achieve a sufficient degree of personal rehabilitation and that, in the dispositional phase, several of the statutory factors warranted termination of his parental rights. Simply put, the respondent challenges the sufficiency of the evidence regarding the issues of personal rehabilitation and the best interest of the child. See *In re Romance M.*, 229 Conn. 345, 353, 641 A.2d 378 (1994). We disagree.

"Our role in reviewing an appeal based on the sufficiency of the evidence is well defined. Where the claim is that the evidence produced did not satisfy the burden of proof factually, the duty of an appellate court is well established. An appeal based on the sufficiency of evidence to support a factual finding carries a legal and practical restriction to review. The function of an appellate court is to review, and not to retry, the proceedings of the trial court. . . . Further, we are authorized to reverse or modify the decision of the trial court only if we determine that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that its decision is otherwise erroneous in law. . . . The probative force of conflicting evidence is for the trier to determine. . . . [W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [court's] verdict . . . ." (Citation omitted; internal quotation marks omitted.) *In re Quanitra M.*, 60 Conn. App. 96, 105–106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000).

## A

The respondent first argues that that there was insufficient evidence to support the court's finding that he had failed to achieve a sufficient degree of personal rehabilitation. He contends that the petitioner failed to

introduce evidence regarding when he could resume responsibility for the child. We conclude that such specific evidence is not required and that the court's finding was supported by the evidence and, therefore, not clearly erroneous.

We begin our discussion by setting forth the applicable legal principles. "Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). We have stated that [p]ersonal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a . . . delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. *It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life. . . .*

"[T]he adjudicatory determination to be made by the trial court is whether the parent of a child who has been found by the [S]uperior [C]ourt to have been neglected [or] uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such

parent could assume a responsible position in the life of the child. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . .

"Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [I]n assessing rehabilitation, *the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . .* Thus, *even if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Alejandro L.*, 91 Conn. App. 248, 259–60, 881 A.2d 450 (2005); see also *In re Amneris P.*, 66 Conn. App. 377, 383–84, 784 A.2d 457 (2001); *In re John G.*, 56 Conn. App. 12, 17–18, 740 A.2d 496 (1999).

In his brief, the respondent strenuously argues that the court improperly placed too much emphasis on his present ability to care for the child and that there was no evidence before the court regarding the length of time it would take for him to assume responsibility for her. With respect to the respondent's first argument, we note that the court's decision must be read in the context of the history of the case. The respondent had received significant services from the petitioner for an extended period of time. Moreover, on July 7, 2003, the

court denied the petition to terminate the respondent's parental rights and specifically stated that he "should be given more time" to achieve rehabilitation. Nevertheless, in its decision on July 14, 2004, the court found that, despite granting him additional time, the respondent still lacked the necessary understanding of his daughter's conditions. Simply put, the court was not focusing exclusively on the respondent's "present" ability but on his inability to achieve rehabilitation over the course of the child's approximate two year placement in foster care, which began in May, 2002.

Turning to the respondent's second argument, we note that he has not referred us to any case requiring such evidence. Our Supreme Court has instructed that the applicable standard in these types of cases "requires the court to find, by clear and convincing evidence, that the level of rehabilitation [a parent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999); see also *In re Jeisean M.*, 270 Conn. 382, 399, 852 A.2d 643 (2004); *In re John G.*, supra, 56 Conn. App. 17; *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). A finding of when the respondent would be able to resume caring for the child was required neither by statute nor by case law. Instead, the court properly examined whether, "within a reasonable time, considering the age and needs of the child, [the] parent could assume a responsible position in the life of the child . . . ." (Internal quotation marks omitted.) *In re John G.*, supra, 17.

We recently emphasized the importance of conducting this inquiry by considering the factual context of the particular child's situation. *"The trial court must also determine whether the prospects for rehabilitation*

*can be realized within a reasonable time given the age
and needs of the child. . . . What constitutes a reason-
able time is a factual determination that must be made
on a case-by-case basis.*" (Citation omitted; emphasis
added; internal quotation marks omitted.) *In re Alejan-
dro L.*, supra, 91 Conn. App. 260; see also *In re Eden
F.*, supra, 250 Conn. 706; *In re Christina V.*, 38 Conn.
App. 214, 220–21, 660 A.2d 863 (1995); see also *In re
Shyliesh H.*, 56 Conn. App. 167, 173–74, 743 A.2d 165
(1999) (respondent's failure to achieve rehabilitation
illustrated by lack of understanding of child's medical,
psychiatric condition).

The child in the present case suffers from the effects
of fetal alcohol syndrome and exhibits numerous devel-
opmental disabilities. As a result, she required, and will
continue to require, extensive medical treatment and
intense participation by her caretaker in assisting her
to maximize her potential. The court acknowledged the
evidence that the respondent had made some progress
in personal rehabilitation.[18] Nevertheless, when viewed
in the light of the child's significant needs, such prog-
ress, made over approximately two years, was insuffi-
cient when considered in relation to the child's special
needs and her need for permanency. Our case law con-
tains numerous examples of a parent, who, despite an
admirable attempt, was unable to achieve rehabilitation
sufficiently and, as a result, lost his or her parental
rights. See, e.g., *In re Vanna A.*, supra, 83 Conn. App.
22–25; *In re Sheila J.*, supra, 62 Conn. App. 479–82
(respondent's efforts at rehabilitation too little, too late
and court's finding that she failed to achieve sufficient
rehabilitation despite some level of stability not clearly

---

[18] As we have stated: "[E]ven if a parent had made successful strides in
her ability to manage her life and may have achieved a level of stability
within her limitations, such improvements, although commendable, are not
dispositive on the issue of whether, within a reasonable period of time,
she could assume a responsible position in the life of her child." (Internal
quotation marks omitted.) *In re Kristy A.*, supra, 83 Conn. App. 318.

erroneous); *In re Shyliesh H.*, supra, 56 Conn. App. 172–75 (although respondent testified that he loved child, trial court's finding that he lacked insight, responsibility to cope with her significant psychiatric disorder supported determination of failure to achieve rehabilitation).

Our review of the record reveals that the evidence credited by the court supports its conclusion that the respondent failed to attain a degree of rehabilitation sufficient to warrant the belief that, at some time in the foreseeable future, he would be capable of assuming a responsible position with respect to the child's care. Accordingly, the court's decision to terminate the respondent's parental rights was not clearly erroneous.

B

The respondent's final argument is that that there was insufficient evidence to support the court's finding that it was in the best interest of the child to terminate his parental rights. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. On appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 835, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005); see also *In re Latifa K.*, 67 Conn. App. 742, 748, 789 A.2d 1024 (2002) (in dispositional phase, court concerned with best interest of child); *In re Jonathon G.*, 63 Conn. App. 516, 528, 777 A.2d 695 (2001) (same).

These seven factors[19] "serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." *In re Quanitra M.*, supra, 60 Conn. App. 104; see also *In re Victoria B.*, 79 Conn. App. 245, 258–59, 829 A.2d 855 (2003). We have held, however, that the petitioner is not required to prove *each* of the seven factors by clear and convincing evidence. *In re Victoria B.*, supra, 259; *In re Jonathon G.*, supra, 63 Conn. App. 528; *In re Quanitra M.*, supra, 105.[20]

The court stated in its memorandum of decision that the parents of the child had been provided with ample, appropriate services, offered on a timely basis, to facilitate the return of their child. The court also concluded that the petitioner had made reasonable efforts at reunification and that the parents had not fulfilled their court-ordered obligations. The court noted the age of the child, and stated that she had "little if any positive feelings toward her mother or [the respondent], but appear[ed] bonded with and [had] significant emotional ties with her current foster parents . . . ." The court found that the petitioner encouraged the parents to maintain a meaningful relationship with the child, and neither economic circumstances nor unreasonable actions of any person prevented such a relationship. With respect to the sixth statutory factor, the court did not make a specific finding in its decision under a

---

[19] See footnote 7.

[20] "Where . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . *The court thus properly determined that the commissioner, in the dispositional phase, need not prove by clear and convincing evidence the seven factors set forth in [General Statutes] § 17a-112 (e) prior to a finding by the court that it is in the best interests of the children to have the respondent's parental rights terminated.*" (Emphasis added; internal quotation marks omitted.) *In re Quanitra M.*, supra, 60 Conn. App. 105.

specific subheading concerning the respondent. Nevertheless, as the petitioner points out in her brief, the majority of the court's decision concerns this factor.[21]

The court, in considering the best interest of the child, focused on her need for permanency, the positive situation with the foster parents and the respondent's continuing inability to obtain a competent understanding of her medically complex status and its corresponding negative long-term effects on her future development.

The respondent first argues that the court improperly failed to make a finding pertaining to him with respect to the sixth statutory factor, that is, "the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . ." General Statutes § 17a-112 (k) (6). The respondent contends that the evidence supports a finding that he maintained consistent visitation with the child and provided her with encouragement and love. Although the court perhaps could have made this finding, it did not, and we are bound by the clearly erroneous standard of review. We cannot say that the court's finding that, despite the respondent's obvious care for the child and best efforts at rehabilitation, it was not in her best interest to return to the respondent's care in the foreseeable future was clearly erroneous. "We decide, not whether we would have drawn the same inferences or found the same facts, but whether the trial court could have reasonably done so." *Greene* v. *Greene*, 13 Conn. App. 512, 514, 537 A.2d 537, cert. denied, 207 Conn. 809, 541 A.2d 1238 (1988). In other words, the court was not obligated or required to make the finding

---

[21] As we have stated, the petitioner was not required to prove each factor by clear and convincing evidence because the factors are guidelines to assist in determining the best interest of the child and not prerequisites to termination.

suggested by the respondent. As we have explained, the record reveals that the respondent failed to understand sufficiently his daughter's medical condition, and it follows that, absent that understanding, it would not be in the child's best interest to be placed in the care of the respondent.

The respondent also challenges two other factual findings of the court. Even if we were to assume arguendo that the court improperly found that the respondent did not substantially comply with the orders of the court and that he did not avail himself of family counseling with P, we would still conclude that the court's ultimate conclusion regarding the best interest of the child was proper.[22] It is clear that the significant and determinative factors considered by the court were the need for permanency, the respondent's inability to comprehend the child's medical situation and the positive environment created for her by the foster parents. The findings challenged by the respondent are not related to these factors.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[22] We note that there was evidence in the record to support the court's conclusion that the respondent failed to comply substantially with the court's orders. Specifically, there was testimony that he failed to provide the petitioner with documentation regarding his participating in Alcoholics Anonymous.