## IN RE MESSIAH S. ET AL.*
## (AC 34324)

Lavine, Espinosa and Peters, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for

inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued May 29—officially released October 1, 2012**

*Dana M. Hrelic*, with whom were *Brendon P. Levesque*, and, on the brief, *Michael D. Perez*, for the appellant (respondent mother).

*Carolyn A. Signorelli*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon* and *Charlene W. Spencer*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother, Stacey S., appeals from the judgments of the trial court terminating her parental rights with respect to four of her minor children pursuant to General Statutes § 17a-112 (j) (3) (B)

---

** October 1, 2012, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

(i)[1] for failure to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in her children's lives. On appeal the respondent claims that the court (1) abused its discretion by failing to recuse itself, (2) failed to undertake an independent analysis of the law and facts of this case and (3) abused its discretion in denying her motion to transfer guardianship of the children.[2] We affirm the judgments of the trial court.[3]

The following procedural history is relevant to this appeal. In April, 2011, the petitioner, the commissioner of children and families, filed four petitions, one each for Messiah S., Aziza B., Jazira B. and Kifayeh B. (collectively children), to terminate the parental rights of the respondent. The petitions alleged that the respondent

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child . . . has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[2] Counsel for the children adopted the position of the respondent.

[3] The termination of parental rights petition concerning Messiah S. also sought to terminate the parental rights of his father, Kirk J., on the ground of abandonment and no ongoing parent-child relationship pursuant to General Statutes § 17a-112 (j) (3) (A) and (D). Kirk J. was defaulted for failure to appear, and the court terminated his parental rights with respect to Messiah S. Kirk J. has not appealed from the termination of his parental rights.

The petitions also sought to terminate the parental rights of Eric B., the father of Aziza B., Jazira B. and Kifayeh B., on the ground of failure to rehabilitate pursuant to General Statutes § 17a-112 (j) (3) (B) (i). The court terminated the parental rights of Eric B. He is not a party to this appeal, as he filed a separate appeal. See *In re Aziza S.-B.*, 138 Conn. App. 639, 53 A.3d 1001 (2012). In this opinion, the term respondent refers to the mother of the children, Stacey S.

is the mother of each of the children, that the department of children and families (department) has made reasonable efforts to reunify the children with the respondent and that the respondent is unable or unwilling to benefit from reunification. On July 28, 2011, Eric B., the father of Aziza, Jazira and Kifayeh, filed a motion to transfer guardianship of Aziza, Jazira and Kifayeh to his sister, Lisa B.-J. On August 22, 2011, the respondent also filed a motion to transfer guardianship of the children to Lisa B.-J. The petitions to terminate the respondent's parental rights were tried on November 4, 7 and 17, 2011. In a memorandum of decision filed January 6, 2012, the court granted the petitions to terminate the respondent's parental rights on the ground of failure to rehabilitate and denied the motions to transfer guardianship of the children to Lisa B.-J. The court denied the respondent's motion to reargue.

In its memorandum of decision, the court made the following findings of fact. The department has been involved with the respondent since December, 2001, due to issues of substance abuse, transience, mental health issues, financial instability and, more recently, domestic violence. The children were committed to the custody of the petitioner on October 29, 2009, after previously having been placed under protective supervision.

The respondent, born in 1972, reported having had a normal childhood and a good relationship with her family. Following high school, she majored in politics and government in college and later earned a master's degree in political theory. She has been employed as a teacher at a group home, as a librarian and as a paralegal. She also was employed by a mortgage company. Despite her education, at the time of trial, the court found that the respondent's employment was menial in nature.

The respondent has never married, but she has had a series of relationships. After college, she met Erroll, whom she dated for five years and with whom she had a daughter, Olivia. Olivia was placed for adoption. The respondent ended her relationship with Erroll in 2001. She then met Kirk J. with whom she had a two month relationship, during which she became pregnant with Messiah. Kirk J. has never offered assistance or been involved in Messiah's life. See footnote 3 of this opinion. The respondent's history with the department, related to mental health issues, substance abuse and unstable housing, began at this time.

The respondent met Eric B. when she was pregnant with Messiah and entered into a serious relationship with him after the child was born. When Messiah was six months old, the respondent and Eric B. moved to Washington, D.C., where Aziza was born. Two years later, they moved to Las Vegas where Jazira was born. The couple returned to Connecticut, and Kifayah was born in Rhode Island in October, 2005.

The respondent gave birth to Eric B., Jr., in October, 2007. A nurse at the hospital informed the department that the respondent had tested positive for cocaine and alcohol at the time of birth. The petitioner took custody of Eric B., Jr., and in July, 2010, the parental rights of the respondent and Eric B. were terminated.

The respondent denies that she has any substance abuse issues, but she tested positive for cocaine use during her last pregnancy in 2007. Prior to trial in November, 2011, the respondent was extremely reluctant to submit her hair for testing. The respondent's Breathalyzer test on April 19, 2011, was positive for alcohol.

Eric B. was born in 1962 and has fathered thirteen children with eight different women; he was fourteen when his first child was born. He was married once,

from 1987 until 2000. Eric B. was arrested seven times between September 16, 1982 and July 2, 2009. On June 13, 2009, he was charged with assault in the third degree, breach of the peace in the second degree and risk of injury to a child arising from his assault of the respondent in front of the children. Eric B. was incarcerated and ordered to have no contact with the respondent. He was placed on probation until July 24, 2009, when he returned to the family home. He admits to using marijuana in high school and denies any history of substance abuse, although he tested positive for cocaine on May 13, 2011. He claims to drink beer socially.

The respondent continues to live with Eric B., and the two are contemplating marriage. At the time of trial, the respondent was employed part-time as a secretary by her church, and Eric B. worked in the delicatessen department of a Stop and Shop supermarket. The two of them continue to avoid therapeutic programs scheduled by the department; they attend sporadically, at best. The court found deep concern over their lack of attention ("no show, no call") to substance abuse tests that are scheduled by the department. Since Eric B. tested positive for cocaine in April and May, 2011, he has avoided further testing and wears his hair too short to be tested. The respondent has had a number of urine tests, but not hair tests, in 2011. She tested negative for substances but her creatinine[4] levels were very low, which rendered the tests results suspicious. She produced a positive Breathalyzer test on April 19, 2011.

The court made factual findings with regard to each of the children as well. Messiah, born in December, 2001, does not know his biological father, Kirk J.[5] See footnote 3 of this opinion. Protective services were

---

[4] Creatinine is a chemical waste molecule that is generated from muscle metabolism and transported through the bloodstream to the kidneys.

[5] Eric B. is Messiah's psychological father.

provided for Messiah, and he was committed to the petitioner's custody on October 29, 2009. Overall, he is in good health, although he suffers from asthma. His 2009 multidisciplinary evaluation produced some scores that place him in the at-risk range. Messiah would benefit from one-on-one therapy to improve his adaptive and communication skills and frustration tolerance. He is a bright and insightful child. Between December, 2009 and May, 2010, Messiah conveyed to his therapist that he was sad that he did not live with his parents, but happy that he did not have to listen to their screaming any more. He reported that he got along with the respondent, but that she yelled a lot. He understood that Eric B. was in jail because he hit the respondent too much, but according to Messiah, Eric B. hits everybody. When the respondent and Eric B. fight, which scares Messiah, the children hide behind chairs in the living room and under their beds. Messiah is bonded with the respondent and Eric B., whom he sees weekly at Family Connections Visitation Center.

Messiah has adjusted well to his foster care placement where he lives with Aziza. He has bonded with his foster mother, Mary M., who is willing to adopt him. His two youngest half siblings are in a foster placement with Mary M.'s sister, and he sees them regularly. At the time of trial, he was in the fifth grade and doing well, taking on more responsibility and doing his work. His teacher thinks that he is an excellent student and selected him for the gifted and talented program.

Aziza was born in April, 2003, in Washington, D.C. A multidisciplinary study conducted in November, 2009, produced at-risk scores indicating that she has difficulty adapting to changing situations and environments. She sometimes struggles to communicate effectively with others. Aziza attended the Abundant Family Counseling Center weekly from December, 2009 through May, 2010. Individual counseling helped her with her transition

into her foster family. During therapy, Aziza reported being happy to see the respondent during visits, but also was scared and sad. She witnessed domestic violence in June, 2009. When she was interviewed by department personnel, she reported that "Daddy doesn't come home sometimes," and, "sometimes Daddy is mad and angry and fights with mommy." She has witnessed Eric B. kicking and scratching the respondent. She claimed that Eric B. screamed at the respondent and the children, which made her scared. She, too, reported that the children hid "behind chairs, in our rooms, everywhere."

Aziza lives in the same foster home with Messiah. She transitioned to the foster home well and enjoys family outings. She has bonded with her foster mother, but expressed a desire to be at home with her parents. If Aziza becomes legally free for adoption, Mary M. has expressed a willingness to adopt her. At the time of trial, Aziza was in the third grade and doing well.

Jazira was seven years old at the time of trial. She attended the Abundant Life Counseling Center from February through August, 2010, and her foster mother has reported positive changes in her behavior. Jazira has reported seeing violence in her home which scared her: "Daddy picked up a chair and threw it at Mommy." She was in the second grade and continues to make progress in all areas. She and her brother Kifayeh were placed together in the same foster home. She is bonded with Messiah, Aziza and Kifayeh. She visits with Messiah and Aziza during supervised visitation, as well as on weekends.

Kifayeh was six at the time of trial and lives in the same foster home with Jazira. He, too, witnessed the domestic violence episode between his parents in June, 2009. He reported seeing Eric B. choking the respondent. Because his parents' fighting scares him, he cries and hides under the kitchen table when they fight. When

Kifayeh initially was placed with his foster mother, Nancy A., there were concerns because he cried for a long time before falling asleep. He received counseling to address that issue. Kifayeh was in the first grade at the time of trial and doing well. His development presents no concerns. He visits with his parents, half brother and sisters weekly.

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Rafael S.*, 125 Conn. App. 605, 610–11, 9 A.3d 417 (2010).

The petitioner alleged that the respondent's parental rights with respect to the children should be terminated on the ground of failure "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (j) (3) (B) (i). The petitioner also alleged that in a prior proceeding, the children were found to be neglected.

The court noted that the law requires it "to find, by clear and convincing evidence, that the level of rehabilitation [the respondent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her children's] life." (Internal quotation marks omitted.) *In re Anvahnay S.*, 128 Conn. App.

186, 195, 16 A.3d 1244 (2011). "[I]n assessing rehabilitation, the critical issue is not whether the [respondent has] improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child[ren] at issue." (Internal quotation marks omitted.) *In re Sarah Ann K.*, 57 Conn. App. 441, 448, 749 A.2d 77 (2000). The court is to consider whether the age and needs of the children would support allowance of further time for the respondent to rehabilitate. See *In re Luis C.*, 210 Conn. 157, 167–68, 554 A.2d 722 (1989). In determining whether further allowance of a reasonable period of time would promote rehabilitation, a court may consider efforts made since the date of the filing of the petition to terminate parental rights. See *In re Sarah M.*, 19 Conn. App. 371, 377–78, 562 A.2d 566 (1989).

The court found that the respondent has yet to achieve a sufficient level of rehabilitation which would reasonably encourage a belief that at some future date she can assume a responsible position in the life of her children. The court credited the evidence the department presented in the termination social study and exhibits, which convincingly established that the respondent has not achieved rehabilitation pursuant to the statute. The department became involved with the family in 2005 when the respondent tested positive for cocaine during her pregnancy with Kifayeh. An earlier substantiation of neglect as to Messiah was determined due to her unaddressed mental health issues. By clear and convincing evidence, the court found that the department made reasonable efforts to achieve the permanency plan.

The court made the following findings in the adjudicatory phase of the trial. The department made extraordinary efforts to reunify the children with the respondent. Time after time services and programs have been offered to the respondent only to have her refuse to

cooperate or leave the program before it was completed. In many cases, she was discharged for lack of compliance. She has not shown the ability to gain insight into her failings as a parent and has proven unable to rehabilitate and provide the care that her children require. The respondent is unwilling or unable to benefit from efforts because she has been unable to show progress toward rehabilitation with regard to mental health, substance abuse, parenting, anger management, domestic violence, housing and employment. She remains in a close relationship with Eric B., who offers little or no parenting support or guidance. Eric B. presents himself as a companion for using and abusing substances.

The respondent continuously has provided positive hair and urine tests, although prior to trial she kept her hair too short to permit testing. Her last positive test for cocaine was February 17, 2010. Subsequent to that date, the respondent's urine tests were negative, but they showed very low creatinine levels for which there was no reasonable explanation. Since May 31, 2011, when she produced a negative hair test, the respondent has refused to sign releases for the department, and she failed to attend or canceled eighteen to twenty test appointments. On April 20, 2011, the respondent produced a positive Breathalyzer test, raising concerns about her use of alcohol.

The court found that the respondent failed to make realistic and sustained efforts to conform her conduct to even minimally acceptable parental standards. She has had more than ten years of failure at recovery, during which time she placed a daughter for adoption and her parental rights with respect to a son were terminated. The court also found that her lack of acceptable housing and her refusal to be concerned about domestic violence have left her unfit to parent. The court noted that a parent's failure to appreciate the risks to her

children posed by the other parent's having access to them, or her inability to care for the child on her own can provide a sufficient legal basis to find that a parent has failed to rehabilitate. See *In re Ellis V.*, 120 Conn. App. 523, 532–33, 992 A.2d 362 (2010). A parent involved in an unstable and chaotic relationship can demonstrate a failure to rehabilitate. *In re Samantha C.*, 268 Conn. 614, 624, 847 A.2d 883 (2004). The respondent is still in an intimate relationship with Eric B., who minimizes his own substance abuse issues, as well as those of the respondent.

The court found it "extremely interesting" that counsel for the children, the respondent and Eric B., each during final argument, stated that granting guardianship of the children to Lisa B.-J. was in the best interests of the children rather than reunification.[6] The respondent's counsel acknowledged that the respondent was a " 'functioning addict,' " " 'an addict in recovery' " and that " 'she did the best she could' " in the programs offered. The court stated that it was not persuaded by the argument that the respondent should regain custody of the children.

Given their ages, ten, eight, seven and six, the court found that the children desperately require stability. They have formed bonds with their respective foster parents, sisters with a remarkable relationship that transfers to the children. The foster parents are willing to adopt the children and are agreeable to letting the children maintain a relationship with the respondent. The children need permanency and stability in their lives, which the respondent is not able to provide given her unresolved issues. The uncertainty of their future has a traumatic effect on them, as does the suggestion of Eric B. and Lisa B.-J., that reunification is their intention. The children need a permanent home where they

---

[6] The court found that counsel also mentioned placing the children in protective supervision.

can flourish, free of substance abuse, domestic violence and other presenting issues. The court made the dispositional findings required by § 17a-112 (k) and concluded that the statutory grounds for termination of parental rights had been proven by clear and convincing evidence.

The court then addressed whether termination of the respondent's parental rights was in the best interests of the children. See General Statutes § 17a-112 (j) (2).[7] The court considered multiple relevant factors, including the children's interest in sustained growth, development, well-being, stability and continuity of their environment; their length of time in foster care, the nature of their relationship with the respondent and the degree of contact the children maintained with the respondent. The court also stated that it had balanced the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with the respondent. The court found by clear and convincing evidence that it was not in the children's best interests to maintain a legal relationship with the respondent.

In its memorandum of decision, the court also ruled on the respondent's motion to transfer guardianship of the children to Lisa B.-J. During final argument, counsel for Eric B. and the children urged the court to grant the motion to transfer guardianship. The court made the following findings. At some earlier time, the department assessed whether Lisa B.-J. could be a resource as the children's guardian. She, however, was not considered a suitable placement because one of her children was involved in the criminal justice system. Lisa B.-J. obtained a foster care license when that child left her

---

[7] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (2) termination is in the best interest of the child . . . ."

home. The court opined that obtaining a license to become a foster parent is just the beginning and that child placement is contingent on many additional factors that Lisa B.-J. has not addressed.

On the basis of Lisa B.-J.'s testimony, the court found that she knew the children, had visited them on occasion, was employed and maintained a comfortable home. The main reason she wished to be named guardian of the children, however, was to help Eric B., when she learned that he was in trouble. She has not considered how she would parent the children, given their specific needs. Moreover, the court found that Lisa B.-J. did not know that Eric B., Jr., had been removed from his parents' care and adopted. She also did not seem to be aware that Eric B. had other children who have been in the care of their mothers since each of them was born. She was not interested in knowing that Eric B. became a father when he was fourteen years old or that he lived the better part of his forty-nine years without having to support, provide housing for or parent his children in any meaningful way.

Moreover, the court found that, on more than one occasion, the children reported that Lisa B.-J. had told them that she wanted to be their guardian so that they could be returned to their parents. Eric B. also led the children to believe that they would be returned to him and the respondent if Lisa B.-J. was their guardian. The court found that Eric B. had something other than permanency in mind when he admitted making those statements to the children and insisted that he would continue to tell them whatever he desired. The court found, however, that it was "abundantly clear" that Lisa B.-J. has very little knowledge with regard to the children and is only interested in helping her brother, who is in trouble. The court concluded that Lisa B.-J.'s goal was not to provide a meaningful family situation

with permanency, stability and the chance for a productive future for the children. The foster parents, however, could make those opportunities possible. The foster parents care for the children extremely well and are bonded with them.

In her motion to transfer guardianship to Lisa B.-J., the respondent stated that such transfer "will allow [the respondent] to play a perpetual role in her children's lives." The court found that the respondent has "played *only* a peripheral role in the lives of these children for many years" and, in fact, has played less of a role when others have assumed care for the children. The court denied the motion to transfer guardianship to Lisa B.-J., and the respondent's motion to reargue the same. The respondent appealed.

In this appeal, the respondent does not claim that any of the court's factual findings are clearly erroneous. In particular, she does not challenge the court's findings that the department made reasonable efforts to reunify the children with her or that she failed to achieve the required level of rehabilitation. In her brief, the respondent admits that she has battled with cocaine and alcohol use. In recent years, she concedes, she refused on several occasions to participate in hair testing and has a history of cancelling and missing tests and other substance abuse treatment appointments.

The standard for terminating parental rights is well known. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether

termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003).

## I

The respondent claims that the court abused its discretion by denying her oral motion that the court recuse itself.[8] Although the respondent's motion was premised

[8] The transcript reveals the following:

"The Court: You know, all these questions you answer yes or no. Go ahead. You're just giving her some latitude here because the questions you are asking is way beyond what a worker or what a supervisor does. It's done up here. But go ahead. What are you looking at him for?

"[The Respondent's Counsel]: Your Honor, I—

"The Court: No, I would like to know. I just want you to move along. How are you going to ask another question if you wait a minute or so to ask another question? Please move on.

"[The Respondent's Counsel]: If I could just have a second?

"The Court: Let's take a ten minute recess.

\* \* \*

"The Court: The court recessed so [the respondent's counsel] and [counsel for Eric B.] could confer. And now they're back.

"[The Respondent's Counsel]: It's with a heavy heart, Your Honor, that I must respectfully request the court to recuse itself.

"[Assistant Attorney General]: Oh, come on.

"The Court: Denied. I've heard this four or five times, and you take an appeal. That's what you do.

"[The Respondent's Counsel]: If I could state the reasons, my reasons?

"The Court: State your reasons.

\* \* \*

"[The Respondent's Counsel]: I think that there—the court has shown an air of bias. And you know, actual bias does not have to be proven. But I think that there has been a showing, and a—I think that it's—there's been a showing that there may be some bias, that the court has repeatedly asked witnesses questions, I believe in an effort to rebut assertions made by the respondents' attorneys. And so, for those reasons, I believe that there has been an appearance that the court is, in fact, through examination of the witnesses and through its oral argument, giving the appearance that there is a bias for the state's case before the evidence has even concluded.

"The Court: All right, so let me tell you something.

"[The Respondent's Counsel]: And I do this with you [all] due respect, Your Honor.

"The Court: You are absolutely wrong—and I'm going to tell you—in what I feel about this case. You're absolutely wrong. I want to get—

"[Assistant Attorney General]: Your Honor—

on what the respondent characterized as an appearance

"The Court: Please, I want to get the evidence out so that I know all about this. And as far as I'm concerned, there is no feeling of bias, whatsoever. I have no bias in this matter at all. I have read much of the evidence and the facts in the case, without anybody saying one word. And I think you would have to agree with this, this has been a tumultuous time for these people and all these children. Things have been going on for a long time. I have to weigh all that. And in order to weigh it, I have to have the trial, have all the evidence you want to put in. I am concerned when someone like you keeps asking questions and then writes for a minute and then asks a question and is not prepared to ask one—cross-examination, ask one question after the other, be ready for that. That's what's bothering me. I don't mind the questions at all, they ought to be answered. But the time you are taking, I think, is extraordinary. And I'm just asking you—when I ask you what you are trying to prove by this, that there was maybe an error, a scrivener's error, maybe they misread something. That, to me, is not going to turn this case one way or the other, with the extreme amount of evidence. It's going to turn on what the witnesses have to say and what is in the evidence. I have no—at this time, I have no bias, whatsoever. Therefore, I am denying your motion.

"[The Respondent's Counsel]: If I may Your Honor, I'm—just so the court is clear, I'm not asserting that the court is biased. I'm just asserting that there has been an improper appearance of bias.

"The Court: That's your opinion that it's improper. It may be an appearance, but improper is your term.

"[The Respondent's Counsel]: The witness gave an answer that was favorable to my client's case, and Your Honor jumped in and attempted to change her answer.

"The Court: No, I didn't at all. I think—I'll tell you what I am doing here. I think this witness is not the person who wrote this. She is the supervisor. She was pressed into duty for this because the person that wrote this is not available, or whatever, she is not available.

"[The Respondent's Counsel]: She signed the . . . the social study.

"The Court: Well, I understand that. But who was the social worker?

"[Department Social Worker]: Rushnee.

"The Court: Who had been on for a long period of time. And this witness—I think the court also has a duty toward people we call as witnesses. I don't think they need to be badgered, and I don't think they need to be asked questions that someone knows they really can't answer. I don't think that's fair questioning of a witness. And I think the court has an obligation toward witnesses as well as toward attorneys and parties before the court. And I think you're attempting to take advantage of this witness; that's what I think. It has nothing to do with how I feel about the case. It does have something to do with how I feel about the way you are questioning this witness, yes; and that's all. Not the questions, the way you're carrying on; that's what's bothering me, not the case."

of bias, the record demonstrates that the respondent's motion was made in response to the court's sometimes heavy-handed manner and sharp rebukes of all counsel. The court's memorandum of decision and the record, however, demonstrate that the court's decision is amply supported by the evidence. We cannot, therefore, conclude that the court abused its discretion by denying the respondent's motion to recuse or that she was denied a fair trial. As the record demonstrates, this is a case that raises issues relating to judicial temperament, not judicial bias.

A

On appeal, the petitioner contends that the respondent's claim of bias is not reviewable because the motion to recuse was not presented to the court pursuant to Practice Book § 1-23,[9] which requires that a motion to disqualify a judge must be filed ten days before the start of trial. We disagree.

Rule 2.11 of the Code of Judicial Conduct requires a judge to "disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned . . . ." (Internal quotation marks omitted.) *Weyel* v. *Catania*, 52 Conn. App. 292, 299, 728 A.2d 512, cert. denied, 248 Conn. 922, 733 A.2d 846 (1999). "The alleged bias and prejudice, to be disqualifying, must stem from an *extrajudicial source* and result in an opinion on the merits on some basis other than what the judge learned from his [or her] participation in the case. . . . Moreover, to support a claim of disqualification, the judge's comments must express a personal bias against the parties and not merely be directed at

[9] Practice Book § 1-23 provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

the merits of the defense claimed based on information presented to him [or her] during a trial on the merits." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Barca* v. *Barca*, 15 Conn. App. 604, 613, 546 A.2d 887, cert. denied, 209 Conn. 824, 552 A.2d 430 (1988).[10]

As in *Barca*, there is no claim here that the court commenced trial with a preconceived view of the termination proceeding, the parties or their counsel. The court's statements and rulings to which the respondent takes exception did not emanate from an extrajudicial source, but were made by the court in response to the manner in which the case was being tried.[11] No Practice Book § 1-23 motion could have been filed ten days before trial, because the circumstances giving rise to the respondent's motion to recuse had not yet occurred. The respondent's counsel orally asked the court to recuse itself during trial in response to the court's comments and rulings. We conclude on the basis of *Giordano* v. *Giordano*, 9 Conn. App. 641, 643, 520 A.2d 1290 (1987),[12] that the respondent "seasonably asserted" her claim of judicial bias during trial on the basis of events that were transpiring in court.

B

We now address the respondent's claim that the court abused its discretion by denying her motion to recuse.

[10] For a catalogue of cases in which the denial of a motion to recuse was upheld on appeal see *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 610–12, 740 A.2d 424 (1999).

[11] Because there was no evidentiary hearing on the respondent's motion, there are no factual findings for us to review. See *Szypula* v. *Szypula*, 2 Conn. App. 650, 653, 482 A.2d 85 (1984) (claim of judicial bias may require evidentiary hearing before another judge).

[12] In *Giordano*, a dissolution action, "[t]he motion to recuse was precipitated by the statement of the trial court, made during a chambers conference on the third day of a six day trial, that sole custody of the child in the defendant was 'not possible.' The motion was made on the record immediately following the chambers conference." *Giordano* v. *Giordano*, supra, 9 Conn. App. 643–44.

As best we can discern from the record as brought to our attention by the parties; see footnote 11 of this opinion; the court exhibited irritation, frustration and impatience with all counsel and the pace at which the trial was progressing. Although some of the court's statements were clearly intemperate, we conclude they do not reflect judicial bias.

"The standard for appellate review of whether the facts require disqualification is whether the court's discretion has been abused. . . . The question then becomes whether an objective observer reasonably would doubt the judge's impartiality given the circumstances. . . . If an objective observer, in view of all of the facts would reasonably doubt the court's impartiality, the court's discretion would be abused if a motion to recuse were not granted. In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 609, 740 A.2d 424 (1999).

The parties have directed us to portions of the transcript from the first day of trial and elsewhere that reveal the court's exasperation with the failure of counsel to have marked exhibits for identification prior to trial, the manner in which objections were made to statements in the case management study, the slow pace of examining and cross-examining witnesses, and the court's impatience with the sometimes less than perfect skills of trial counsel. We do not condone the court's blunt and sometimes sarcastic expressions of frustration, but the record informs us that the court periodically admonished *all* counsel "to move [things]

along," so that the issues could be resolved in an expedient manner for the sake of the children.[13] Although the court displayed exasperation with some of counsels' conduct, we cannot conclude that it harbored a bias against any party or any particular counsel. In no

[13] The transcript reveals the following colloquy between the court and counsel when exhibits were being marked, including the social study prepared by the department pursuant to General Statutes § 45a-717 (e) (1).

"The Court: Okay. Let's say this: any of those references that are opinions in any of the documents you have talked about or any of the further documents, the court will not take notice of.

"[Assistant Attorney General]: Your Honor—

"The Court: Unless you put these in and you have given them an opportunity—that's enough. That's enough. We've got a thousand pages here, madam.

"[Assistant Attorney General]: I understand that, Your Honor.

"The Court: That's more than enough. I think by eliminating some of these things, as I'm suggesting, that those matters of opinion that [the respondent's counsel] does not want me to look at or to take into consideration, that I am not going to anyway, but that I am saying I will not take notice of those things that he is objecting to.

"[Assistant Attorney General]: The references to those tests, the reference to the hair tests and the references to the—

"The Court: Madam, you don't need to say it twenty-five times.

"[Assistant Attorney General]: I understand that. But those tests are—we have to report that as part of your statutory obligation.

"The Court: Fine, fine. You don't need to report it two or three times, madam. You can sit here all day and argue about this, I'm not going to do it.

"[Assistant Attorney General]: I understand that, Your Honor. But [the respondent's counsel] is making his record for his appeal.

"The Court: I'm going to tell [the attorney for the minor children, counsel for the respondent], and [counsel for Eric B.], I'm done talking about these, madam. I think we're wasting a lot of time. We should get on with the trial. I want to see some witnesses in here to tell me and the cross-examination and hear that and get both sides, not just someone's—your opinion, [the opinion of the counsel for the minor children], or your opinion, [counsel for the respondent], as to what we should be doing."

On the first day of trial, the court acknowledge its frustration with how long it took to mark exhibits, a process that should have been handled prior to the start of trial.

"The Court: Call your first witness. . . . Let's see, it's now quarter of eleven, so we just—so I just want to say, yes, to all of you who recognize the frustration that the court has shown this morning with an hour and a quarter gone from trial because of marking exhibits and discussions that could have been had before. So, if you would acknowledge my frustration, perhaps anyone sitting in this position, hearing what I heard the last hour and forty-five minutes would be frustrated."

We note the standing orders for juvenile matters on the child protection docket, which require under § 5 (B) of the trial management procedures: "Two weeks prior to any assigned trial date, a trial management conference shall be scheduled to secure the following: (1) agreements and premarking of exhibits."

instance did the court predetermine the credibility of any witness or issue. Compare *Cameron* v. *Cameron*, 187 Conn. 163, 165–68, 444 A.2d 915 (1982). We conclude that the court did not abuse its discretion by failing to recuse itself. Moreover, we discern nothing in the court's memorandum of decision evidencing bias as the court's findings are amply supported by the evidence.

"A judge is not an umpire in a forensic encounter. . . . He is a minister of justice. . . . He may, of course, take all reasonable steps necessary for the orderly progress of the trial." (Citations omitted.) Id., 169. A trial judge "has a duty to maintain a calm demeanor, the decorum of the courtroom and avoid any action which might suggest partiality. . . . A judge, however, is a human being, and not the type of unfeeling robot some would expect the judge to be. Such a display of exasperation . . . falls far short of a reasonable cause for disqualification for bias or prejudice under [rule 2.3] of the Code of Judicial Conduct." (Citation omitted; internal quotation marks omitted.) *Barca* v. *Barca*, supra, 15 Conn. App. 614. In this case, the court's unfortunate display of frustration did not evidence bias. The respondent, therefore, cannot prevail on her claim.

II

The respondent's second claim is that the court abused its discretion by failing to conduct an analysis that termination is in the best interests of the children as required by § 17a-112 (j) (2). The respondent claims that, when undertaking its analysis of the best interests of the children, the court copied "almost word-for-word" the analysis it used in prior unrelated and factually distinct cases.[14] We disagree that the manner in

---

[14] In a footnote, the respondent cites sixteen termination of parental rights cases decided by the court between March 7 and December 2, 2011. In other footnotes, the respondent notes that in writing the various opinions, the court changed the singular to the plural and the gender of pronouns where necessary. The court also removed the words domestic violence and added mental health treatment where required. These facts demonstrate that the

which the court set forth its conclusions in this matter affected the outcome. The critical issue "is not how the court reported its findings but whether sufficient evidence [in the record] supported the court's finding that the petitioner proved, by clear and convincing evidence"; *In re Halle T.*, 96 Conn. App. 815, 828, 902 A.2d 670, cert. denied, 280 Conn. 924, 908 A.2d 1987 (2006); that termination was in the best interests of the children.[15]

court did not blindly cut and paste text, but was cognizant of the evidence, the issues and the parties before it and used a prototype as a "skeleton" opinion.

[15] In its memorandum of decision, under the heading "[b]est [i]nterest of the [c]hildren," the court stated that it was "next called upon to determine whether termination of [the respondents'] parental rights to their children would be in their best interest. Applying the appropriate legal standards to the *clear and convincing facts of this case*, the court finds this issue in favor of [the petitioner]." (Emphasis added.) The court then set forth the legal principles applicable to the determination of the best interest of the child in all cases. The respondent takes no issue with the guiding principles on which the court relied.

The court then stated: "Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in the children's best interest to continue to maintain any legal relationship with their parents." It found that the respondent has failed to gain insight into becoming a safe, nurturing and responsible parent for the children. Her judgment and conduct remains questionable as it has not improved since the children were taken into the petitioner's custody. The court found that the respondent lacks "the attributes and characteristics necessary to fulfill [a] valid parental [role]." Her "recalcitrance concerning referrals clearly and convincingly [show] that, without commitment to consistent substance abuse treatment, as well as individual, domestic violence and parenting counseling, it is likely that [she has] extinguished what little chance [she] ever had to be able to serve as [a] safe, nurturing and responsible [parent] for any child."

The court also considered the children's pressing need for permanence and stability. It found that the respondent requires much time to show that she has forsaken substance abuse, addressed her other issues, undertaken necessary counseling and succeeded in it. The respondent needs to establish herself in the community and demonstrate that she is capable of being a safe, nurturing and responsible parent to her children. The court also found that the children cannot delay their need for permanence and stability in exchange for the respondent's uncertain future.

On the basis of the respondent's behavior and performance to the time of trial, the court could not foresee her having the ability or the opportunity to be able to follow the regimen necessary for the children to maximize their abilities and achievements. It found that the children cannot afford the time the respondent needs to establish herself in the community as a

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Sheena I.*, 63 Conn. App. 713, 719, 778 A.2d 997 (2001).

On the basis of our review of the best interests of the children portion of the court's memorandum of decision in this case and with other decisions authored by the court that the respondent included in the appendix to her brief, we note the similarity of the criteria the court considered. Those criteria are mandated by statute and judicial decisions. We also acknowledge the similarity between much of the court's language and some of the court's conclusions. That similarity, however, reflects regrettably the unfortunate consequences that result from the failure to rehabilitate due to addiction. Our review discloses that the manner in which the court expressed itself indicates that it fully was aware of the allegations against the respondent and engaged in independent analysis based on the facts presented in this case. The court considered the elements that it must consider in any termination of parental rights case, which the respondent does not dispute.

safe, nurturing and responsible parent, if at all. The respondent's behavior clearly and convincingly shows that it is unlikely that she will ever be able to conform her behavior to appropriate norms for a parent.

The court noted that "long-term stability is critical to a child's future health and development . . . ." (Internal quotation marks omitted.) *In re Katia M.*, 124 Conn. App. 650, 659, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010). Time is of the essence when resolving issues related to the permanent or temporary care of neglected children "because of the psychological effects of prolonged termination proceedings on young children . . . ." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 221, 15 A.3d 194 (2011). The court concluded that termination of the respondent's parental rights was in the best interests of the children.

Moreover, we cannot conclude that the court's conclusions are unsupported by its factual findings that appear elsewhere in its decision. The respondent has not challenged those findings as being clearly erroneous nor does she challenge the court's findings that she failed to rehabilitate or its findings made pursuant to § 17a-112 (k).

The respondent claims that the court failed to consider the testimony of the children's foster parents or the attorney for the children in its analysis. We disagree. "The court's decision must be read and construed in its entirety." *Mafcote Industries, Inc.* v. *Gannicott Ltd.*, 60 Conn. App. 393, 396, 759 A.2d 153 (2000); see also *In re G.S.*, 117 Conn. App. 710, 719, 980 A.2d 935 (review court's decision in its entirety), cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

In its memorandum of decision, under the heading of failure to rehabilitate, the court stated in relevant part: "It is extremely interesting to the court that during final argument by the attorneys for the children and . . . [for the respondent], all felt that the granting of guardianship to . . . Lisa [B.-J.] was in the best interests of the children, rather than reunification with the parents (although protective supervision was also mentioned). [The] [a]ttorney for [the respondent] acknowledged that she was a 'functioning addict,' an 'addict in recovery,' and that 'she did the best she could' in the programs offered. This is not in the least persuasive as to [the respondent's] regaining custody of the children.

"These children have formed bonds with their respective foster parents who happen to be sisters, and have a remarkable relationship with each other which transfers to the children. The foster parents are willing to adopt the children and are agreeable to maintaining a relationship with the children's parents. The children are in need of permanency and stability in their lives and this is not possible with [the respondent's] unresolved

issues." Given this language, we conclude that the court, in fact, did analyze the best interests of the children on the basis of the facts in this case.

The respondent relies on *In re Halle T.*, supra, 96 Conn. App. 815; and *Grayson* v. *Grayson*, 4 Conn. App. 275, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987); to support her claim. With regard to the manner in which the various trial courts wrote their decisions, *In re Halle T.* and *Grayson* are factually different. Those cases, however, stand for the rule that this court will not reverse the decision of the trial court if its conclusions are supported by evidence in the whole record, which is the determinative principle here.

In *Grayson*, this court stated its disapproval of the practice of a trial court in copying verbatim the proposed findings of fact submitted to the court by one of the parties after a hearing. *Grayson* v. *Grayson*, supra, 4 Conn. App. 283. This court, however, found that the losing party was not denied a fair trial. Id., 284–85. The court identified the issue as "whether the trial court's findings are supported by the evidence and are in substantial accord with the opinion . . . ." Id., 285.

In *In re Halle T.*, supra, 96 Conn. App. 823, the father claimed that the trial court "violated his federal and state constitutional rights by adopting verbatim significant portions of the social studies in its written memorandum of decision." This court has "made clear that 'parroting' significant portions from an exhibit into a memorandum of decision is a course of action that we neither endorse nor approve"; id. 827; but has concluded that the "verbatim adoption of the findings proposed by a prevailing party is not a per se finding of a denial of a fair trial." Id., 825–26. "[T]he ultimate test as to the adequacy of [the] findings is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for the decision and *whether they are*

*supported by evidence.*" (Emphasis in original; internal quotation marks omitted.) Id., 826.

In this case, the court did not adopt findings of fact proposed by any of the parties. The respondent does not dispute that the court made its factual findings on its own, and she does not dispute that the evidence supports those findings. The court may have taken a shortcut by adopting the language that it had used in previous termination of parental rights cases, but this does not lead us to conclude that it abdicated its fact-finding role. The court's factual findings are supported by the evidence and are sufficient to support its legal conclusion that it was in the best interests of the children to terminate the respondent's parental rights. The court, therefore, did not abuse its discretion. Moreover, in evaluating the propriety of the court's decision, "[w]e remain mindful of the 'suffocating court dockets' and the 'desire to hasten the procurement of justice.' " *In re Halle T.*, supra, 96 Conn. App. 826. The respondent's claim therefore fails.

### III

The respondent's third claim is that the court abused its discretion by denying her motion to transfer guardianship of the children to Lisa B.-J. We disagree.

"To determine whether custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. . . . We have stated that when making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp the authority or to substitute ourselves for the

trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . [Appellate courts] are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the [trial court] when they are based on reliable evidence." (Internal quotation marks omitted.) *In re Marcus S.*, 120 Conn. App. 745, 752–53, 994 A.2d 253, cert. denied, 297 Conn. 914, 995 A.2d 955 (2010). The trial court makes a determination regarding placement in the best interest of the child as shown by a fair preponderance of the evidence. *In re Valerie G.*, 132 Conn. App. 652, 662, 34 A.3d 398 (2011), cert. denied, 303 Conn. 937, 36 A.3d 696 (2012). Credibility determinations are made by the finder of fact. *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999).

Lisa B.-J. testified at trial. The court found that she was unaware that Eric B., Jr., had been removed from the respondent's care and adopted,[16] did not know that

[16] Lisa B.-J. testified in part as follows:
"The Court: And did you know she was . . . the children were under protective supervision at that time [2005]?
"[The Witness]: No, I did not.
"The Court: Did you know if [the department] was involved?
"[The Witness]: No. No, I did not.
* * *
"The Court: When did you first find out [the department] was involved?
"[The Witness]: I guess 2009 when he was taken from school, I got a call. . . .
"The Court: All right. And let's see . . . that was about October 27 when he was born. He was taken. His mother tested positive for cocaine. The parents' rights were terminated as to [Eric B., Jr.] on July 6, 2010. Did you know all about that, that the [department] was involved then?
"[The Witness]: I know that he was taken. I guess I was assuming that [the department] was in then. But I mean, their business is their business."

Eric B. had substance abuse issues[17] and had little knowledge of the specific needs of the children.[18] In the court's assessment, although Lisa B.-J. had a foster care license, she had not reached the point of how she would parent the children[19] and their specific needs.[20]

[17] Lisa B.-J. testified in part:

"[Assistant Attorney General]: And you are aware of the substance abuse issues in this case, are you?

"[The Witness]: I am not.

"[Assistant Attorney General]: And so—well, you are not. So [Eric B.] has not talked to you about—

"[The Witness]: He is talking to me about children.

"[Assistant Attorney General]: There is no question. He has not talked to you about why the department is involved with him and his family?

"[The Witness]: No."

[18] Lisa B.-J. testified in part:

"The Court: Does [the issue of substance abuse] change your mind at all about how you want to handle this matter?

"[The Witness]: Oh, definitely. I still want to be able to help them in any way I possibly can. But I also want them to help themselves.

"The Court: Well, if they don't help themselves, can they be allowed visits with the kids?

"[The Witness]: If the state was involved and said they had to . . . .

"The Court: No, no, no, just you.

"[The Witness]: I'm just answering, if the state was involved and they had to, then I'm following the guidelines. My brother knows from way back when how I run my house, how I run my life. So if he comes anywhere, anywhere I am, my house, my home, my anywhere, and he is not correct in his demeanor, we don't associate with each other. He knows this."

[19] Lisa B.-J. testified in part:

"[Counsel for Eric B.]: Now, you understand that there was a petition for the court to terminate parental rights?

"[The Witness]: Yes.

"[Counsel for Eric B.]: Did you know that this had been pending for awhile?

"[The Witness]: The one day I came to court in August, that's when I found out about all that.

"[Counsel for Eric B.]: This is all of this year?

"[The Witness]: August of 2011.

"[Counsel for Eric B.]: This was after you found out that you can get guardianship of the children?

"[The Witness]: Yes, yes.

"The Court: Wait a minute. Has that been done?

"[Assistant Attorney General]: Has what been done?

"The Court: She said that's when she found out she could get guardianship of the children. Who said that? . . .

"[Assistant Attorney General]: That's not the department's plan.

"The Court: Who told her that?

"[Counsel for Eric B.]: Your Honor, my client asked if she . . . would accept the transfer of guardianship. And she has indicated by her testimony that she did not know that she could accept guardianship of the children, until she learned that in July."

[20] Lisa B.-J. testified in part:

"The Court: Do you think this use of substances over the last few years had an affect on the children or could it?

"[The Witness]: It always could. When I see his kids, they always seem to be happy, well groomed, well fed, education-wise doing great.

The court found that she was interested in helping her brother, Eric B.[21] Moreover, the court found that on more than one occasion, the children reported to their foster parents that Lisa B.-J. had told them that she was interested in gaining guardianship so that she could return them to the respondent and Eric B.

On the basis of our review of the record, including the testimony of Lisa B.-J., we conclude that the court did not abuse its discretion in denying the motion to transfer guardianship of the children to her. In its memorandum of decision, the court demonstrated that it was aware of the position of the children's foster parents who favored long-term foster care over adoption. The court found, however, that the foster parents were willing to adopt the children and to permit the children to maintain a relationship with the respondent, which was the objective of the respondent's motion to transfer guardianship to Lisa B.-J.[22] Finally, the court determined that the children needed permanency and stability; see *In re Katia M.*, 124 Conn. App. 650, 658, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010); which their foster parents were willing and able to provide for them.

The judgments are affirmed.

In this opinion ESPINOSA, J., concurred.

PETERS, J., concurring. Canon 2 of the Code of Judicial Conduct " 'requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality

---

"The Court: So why do think the state took them?

"[The Witness]: You just told me it was a substance abuse case."

[21] Lisa B.-J. testified in part:

"[Counsel for Eric B.]: Whether [the respondent and Eric B.] decide to get their act together or not, your commitment is to the children?

"[The Witness]: My commitment is to the children, yes. But I would never turn my back on my brother or [the respondent]."

[22] In her motion to transfer guardianship, the respondent stated in part: "A transfer of guardianship to [Lisa B.-J.] will allow [the respondent] to play a perpetual role in her children's lives."

might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances.' . . . Disqualification is required even when no actual bias has been demonstrated if a judge's impartiality might reasonably be questioned 'because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority.' . . . [P]revention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process." (Citations omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 20–21, 970 A.2d 656 (2009).

I agree with the majority opinion's detailed description of the conduct of the trial court that led counsel for the respondent, Stacey S., the children's mother, to file a motion for disqualification. I recognize that, on appeal, the question is "whether the court's discretion has been abused." *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 609, 740 A.2d 424 (1999). I am, nonetheless, persuaded that the facts described by the majority establish that "an objective observer reasonably would doubt the judge's impartiality given the circumstances [of this case]." (Internal quotation marks omitted.) *Johnson* v. *Board of Education*, 130 Conn. App. 191, 209, 23 A.3d 68 (2011). From the outset of the trial, the judge not only vented his frustration but, at the very least, created an atmosphere that impaired the efforts of the respondent's counsel to present her case.

I also, however, agree with the majority opinion that the petitioner, the commissioner of children and families, provided ample evidence to sustain her burden of proof that the respondent's parental rights should be terminated. I am not persuaded that the improper denial

of the respondent's motion for recusal was a structural error that requires reversal of the court's judgments in favor of the petitioner.

In *Wiseman* v. *Armstrong*, 295 Conn. 94, 104, 109–11, 989 A.2d 1027 (2010), our Supreme Court held that the improper failure of a trial court to honor a litigant's request for a jury poll pursuant to Practice Book § 16-32 was not a structural error, even though, concededly, compliance with the rule of practice was mandatory. In *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 635–37, 904 A.2d 149 (2006), our Supreme Court held that, in civil cases, awards of peremptory challenges not required by law are subject to harmless error review, and not structural error review, even if only one of the parties has received such awards. These cases are persuasive precedent for reviewing the trial court's failure to recuse itself in accordance with the ordinary common-law rules for reversible error, rather than by the special rules that govern claims of structural error.

In the present case, despite the trial court's improper failure to recuse itself, the record establishes a sound factual basis for the court's decision to terminate the respondent's parental rights. The court made the requisite factual findings, and those findings were supported by the facts presented by the petitioner.

I respectfully concur in the judgment of the court.